**EXHIBIT A**

CIVIL ACTION NO.:   11-6352

GUY WILLIAMS

    Plaintiff

      v.

OFFICER KENNETH LUGO, et al
Defendants

    - - -

    Tuesday, June 19, 2012

    - - -

    Oral sworn deposition of OFFICER KENNETH

LUGO was taken at the law offices of PARKER McCAY,

P.A., 1009 Lenox Drive, Suite 102A, Lawrenceville, New

Jersey, before Aubrey D. McNally, Certified Court

Reporter, Registered Professional Reporter and Notary

Public of the State of New Jersey, on the above date,

commencing at 10:15 a.m., there being present:

    WEISBERG LAW, P.C.
    BY:  GRAHAM F. BAIRD, ESQUIRE
    ATTORNEYS FOR THE PLAINTIFF

    PARKER McCAY, P.A.
    BY:  J. BROOKS DIDONATO, ESQUIRE
    ATTORNEYS FOR THE DEFENDANTS

DEGNAN & BATEMAN
(856)  232-7400

## Page 2

```
 1            (It is agreed by and between counsel
 2   that the reading and signing of the deposition be
 3   waived and that all objections, except as to the form
 4   of the question, be reserved until the time of trial.)
 5
 6
 7                    I N D E X
 8   Witness                               Page
 9   OFFICER KENNETH LUGO
10   BY MR. BAIRD                           3
11
12            - - -
13
14            E X H I B I T S
15   EXHIBIT        DESCRIPTION            PAGE
16     1     Affidavit of Probable Cause    43
17     2     Incident Report                47
18     3     Case Supplemental Report       50
19
20
21
22
23
24
25
```

## Page 3

```
 1            . . .OFFICER KENNETH LUGO, after having
 2   been duly sworn, was examined and testified as
 3   follows:
 4            - - -
 5   BY MR. BAIRD:
 6        Q    Good morning, Officer.
 7        A    Good morning.
 8        Q    My name is Graham Baird, and I'm a
 9   Lawyer and I represent Guy Williams in a case that
10   we have filed against you as well as your employer
11   concerning an arrest that you made back on May 2nd
12   of 2009.  Today we're here for your deposition
13            Have you ever given deposition
14   testimony before?
15        A    A long time ago.
16        Q    Okay.  I'm going to run through some
17   instructions and guidelines for you to follow to
18   make this go as quickly and as smoothly as possible,
19   okay?
20        A    Okay.
21        Q    All right.  Sitting on your right is a
22   court reporter and she's basically taking down
23   everything that is said in the room.  So with that
24   in mind, it's very important for you to keep your
25   responses to my questions verbal.  We try to stay
```

## Page 4

```
 1   away from nuh-uh, uh-huh, shrugging the shoulders,
 2   nodding the head, shaking the head because it's
 3   difficult for her to take down and we want to keep a
 4   very clear record.
 5        Q    Is that okay with you?
 6        A    Yes.
 7        Q    All right.  The other instruction I'll
 8   give along those lines is that you and I should not
 9   talk over each other, okay?  Inevitably, it usually
10   happens during the deposition that you and I will
11   talk over each other, but we should avoid that as
12   much as possible, again, so that she can take it
13   down.
14            Even if you know where a question of
15   mine is going, I would ask that you please wait
16   until I finish the full question and I will
17   certainly give you the courtesy to wait until you
18   provide a complete answer before I ask another
19   question, okay?
20        A    Yes.
21        Q    All right.  You can take a break at any
22   time for whatever reason you want.  If you want to
23   walk around, talk to your lawyer, get a drink of
24   water, whatever, just let me know, okay?
25        A    Yes.
```

## Page 5

```
 1        Q    The other thing is that if there's a
 2   question pending, the rules are that you should
 3   answer that question before we take our break; is
 4   that okay?
 5        A    Yes.
 6        Q    All right.  No one here wants you to
 7   guess at anything, okay?  If you would like to
 8   estimate as to dates, times, distances, things of
 9   that nature, that's fine, just let us know that
10   you're making an estimate, okay?
11        A    Yes.
12        Q    At some point you may not remember
13   something, okay?  And if you don't remember
14   something, I don't remember is a perfectly
15   acceptable answer to give.  We all realize that this
16   happened May 2nd, 2009 and you're a police officer
17   and there's no doubt that you participated in
18   numerous arrests from the time of Mr. Williams'
19   arrest up until the present day, so if you don't
20   remember something, I don't remember is a perfectly
21   acceptable answer, so is I don't know, okay?
22        Q    So if you don't know something, I
23   don't know is a perfectly acceptable answer.  But
24   I want you to be aware that there's a subtle
25   difference between I don't know and I don't
```

Page 6

```
1   remember.
2       Q    Do you understand that?
3       A    Yes.
4       Q    Okay.  So with that said, can you tell
5   me who you work for?
6       A    I work for the city of Trenton,
7   Trenton Police Department.
8       Q    Okay.  And how long have you been with
9   the Trenton Police department?
10      A    This is my second go-around with the
11  Trenton Police Department and it's been since
12  March of 2004.
13      Q    Okay.  So from March of 2004 until the
14  present day you have been employed with the Trenton
15  Police Department?
16      A    Yes.
17      Q    Okay.  And prior to March 2004 you
18  mentioned that there was another time when you were
19  employed by Trenton.  Can you tell me when that was?
20      A    It was from October of 1986 to May of
21  1994.
22      Q    Okay.  May of '94, did you say?
23      A    Yes.
24      Q    Okay.  And why did you leave the Trenton
25  Police Department in May of '94?
```

Page 7

```
1       A    I accepted a position with the tucson
2   Arizona Police department.
3       Q    Did you leave the Trenton Police
4   Department on good terms?
5       A    Yes.
6       Q    Okay.  And then you worked at the
7   Tucson Police Department from, say, May or June of
8   '94 until when?
9       A    until 1997.  I'm not sure of the
10  exact month.
11      Q    Okay.  And my understanding, based upon
12  some of the records that your counsel has provided,
13  is that your employment was severed or otherwise
14  terminated by Tucson Police Department; is that
15  accurate?
16      A    Yes.
17      Q    And can you tell me the reason why it
18  was terminated in 1997?
19      A    I lied to my supervisor about a
20  location I was at.
21      Q    Okay.  And can you tell me what the
22  circumstances of that incident were?
23      A    I was out of my area.  I was two
24  blocks out of my area.
25      Q    Okay.
```

Page 8

```
1       A    I happened to be speaking to an
2   officer that was being watched by our sergeant.
3       A    He was being watched by your sergeant?
4       Q    Yes.
5       Q    Your sergeant was investigating his
6   activities; is that accurate?
7       A    Yes.
8       Q    Okay.  And were you in your patrol car
9   that day?
10      A    Yes.
11      Q    Was there any other reasons besides
12  your untruthfulness there for the termination of
13  your employment?
14      A    No.
15      Q    Okay.  And then in '97 did you obtain
16  other employment?
17      A    From '97 and for the next five years
18  I worked at Home Depot.  I was out of police work.
19      Q    Okay.  And which Home Depot?  Where
20  were you located?
21      A    Tucson, Arizona.
22      Q    Okay.  Did you work in security or were
23  you a floor associate?
24      A    I was a floor associate.
25      Q    Okay.  And then would it be accurate
```

Page 9

```
1   for me to say that in march 2004 you came back to
2   Trenton, is that --
3       A    No.  I obtained a job with the Benson
4   Arizona Police department -- I'm going to
5   backtrack -- in June of 2002.
6       Q    Okay.
7       A    In September of 2003, I resigned and
8   moved back to New Jersey.
9       Q    Okay.
10      A    At that time I accepted a job with
11  the Trenton Police Department.  I was a dispatcher
12  from September until March.
13      Q    You attended dispatching school, right?
14      A    Yes.
15      Q    And was there any reason why you
16  weren't on patrol?
17      A    I was brought back as a dispatcher
18  and waited until the next academy class was
19  available.
20      Q    So that was in September of 2003 you
21  were hired on as a dispatcher?
22      A    Yes.
23      Q    Okay.  And then in March of 2004, you
24  went back to patrol; is that true?
25      A    I attended partial -- the partial
```

3

## Page 10

```
 1   academy.
 2        Q.   Okay.  And when did you basically start
 3   working as a patrol officer again for Trenton?
 4        A.   Summer of 2004.
 5        Q.   Now, since summer of 2004 to the
 6   present have you received any promotions?
 7        A.   I was promoted to detective.  I don't
 8   recall when I was promoted to detective and
 9   transferred to the TAC unit.
10        Q.   Okay.  Tell me what the TAC unit is.
11        A.   Tactical Anti-Crime Unit.  They go
12   out and they look for street crimes, guys on the
13   corner selling drugs, things of that nature.
14        Q.   Okay.  What's the QPR unit?
15        A.   QRT?
16        Q.   QRT, excuse me.
17        A.   It was the Quick Response Team.  That
18   was a unit that was formed by myself and my
19   partner at the time.
20        Q.   Was your partner Sean miles at that
21   time?
22        A.   Yes.
23        Q.   And the Quick Response Team, you and
24   Sean developed that program; is that right?
25        A.   Yes.
```

## Page 11

```
 1        Q.   Okay.  Can you tell me what the
 2   impetuous behind your development of that QRT was?
 3        A.   Sean had some experience.  He had
 4   been in the vice unit before, so he had experience
 5   with search warranties.  He started doing some
 6   search warranties and it became successful.  I
 7   stated going search warranties with his help and we
 8   became extremely successful.
 9             So they removed us from the TAC unit,
10   added two people to our unit, so it was a four-man
11   unit.  We were under the supervision of a sergeant
12   and we did our own work.
13        Q.   Okay.  And who are the other two men in
14   your unit?
15        A.   At that time it was Detective Yolanda
16   Ward and Detective Chris Francievich.  Do you need
17   that to be spelled?
18        Q.   Francievich, definitely.
19        A.   It's F-R-A-N-I-C-E-V-I-C-H.
20        Q.   Okay.  And all four of you were
21   detectives; is that accurate?
22        A.   Yes.
23        A.   That I don't recall.
24        Q.   Okay.  Was it before or after May of
25
```

## Page 12

```
 1   2009?
 2        A.   Before.
 3        Q.   Were you working on QRT when the arrest
 4   of Mr. Williams occurred?
 5        A.   Yes.
 6        Q.   Okay.  Who was your sergeant, if you
 7   can remember, around May of 2009?
 8        A.   Paul Gendron, G-E-N-D-R-O-N.
 9        Q.   Now, Detective Francicevich, is he still
10   employed by the Trenton Police Department?
11        A.   Yes.
12        Q.   Okay.  Is he still a detective?
13        A.   Yes.
14        Q.   Do you know what unit he works in?
15        A.   Vice.
16        Q.   Okay.  How about Yolanda Ward?
17        A.   No.
18        Q.   Do you have any knowledge as to why her
19   employment separated with Trenton Police?
20        A.   She was laid off.
21        Q.   Do you do cutbacks?
22        A.   Yes.
23        Q.   Other than your promotion to detective,
24   did you obtain any other promotions from March of
25   2004 until the present?
```

## Page 13

```
 1        A.   No.
 2        Q.   And your rank today is detective; is
 3   that correct?
 4        A.   No, my rank today is officer.
 5        Q.   Oh, okay.  Can you tell me why you are
 6   now an officer today rather than being a detective?
 7        A.   I put a letter in to go back to
 8   patrol.
 9        Q.   Okay.  Is there a reason why you put
10   that letter in?
11        A.   I was in the vice unit.  I knew I was
12   going to be transferred out because of cutbacks
13   they were going to be sending people back to
14   supplement patrol, so I submitted a letter to try
15   and secure a position on day shift before they
16   transferred me.
17        Q.   Okay.  So it was not related to any
18   kind of performance issue with Trenton --
19        A.   No.  I'm sorry, no.
20        Q.   Okay.  The purpose of you putting the
21   letter in was so that you could secure a position in
22   the day shift because you could see cutbacks coming?
23        A.   Yes.
24        Q.   Okay.  Did you go from the QRT, Quick
25   Response Team, to vice?
```

## Page 14

1 A. Yes.
2 Q. And do you remember approximately what
3 time period it was when you transferred to vice?
4 A. I don't recall.
5 Q. Okay. Was the Quick Response Team
6 disbanded or were there new detectives assigned to
7 it? What happened with the Quick Response Team?
8 A. We were disbanded.
9 Q. Do you know why you were disbanded?
10 A. We were overlapping vice
11 investigations.
12 Q. Okay. So the powers that base that, we
13 don't need the Quick Response Team if they're
14 overlapping vice investigations, we should just fold
15 them back into vice?
16 A. Yes. Only two of us went to vice.
17 Q. who went to vice?
18 A. Myself and Detective Francevich.
19 Q. What happened to Detective Sean Miles?
20 A. Detective Miles went back to patrol.
21 Q. Is he currently on patrol?
22 A. Yes.
23 Q. Okay.
24 A. As did Detective Ward.
25 Q. And then something after Detective Ward

## Page 15

1 went back to patrol, she was laid off due to the
2 cutbacks?
3 A. All right. And Sean Miles is still
4 employed?
5 A. Yes.
6 Q. What about the TAC unit? Is that still
7 operating?
8 A. Yes.
9 Q. Okay. Can you generally explain to me
10 what the difference between the TAC unit and the
11 vice unit is?
12 A. The TAC unit goes out in uniform and,
13 for lack of a better word, will attack street
14 crime. The vice unit responds to tips from the
15 public and from just, you know, other officers and
16 develops their own investigations, executes search
17 warrants.
18 Q. Okay. On May 2nd, 2009 you effected an
19 arrest on Mr. Williams; is that correct?
20 A. Yes.
21 Q. Can you tell me what, if anything, you
22 remember about that? And try to start at the
23 beginning, if you would, Officer.
24 A. I was on duty. It was the night

## Page 16

1 shift. We were working until 3 o'clock in the
2 morning. My partner was off. Detective Miles was
3 off that night, and he gave me a -- he called me
4 on my cell phone to tell me that he had received
5 information about a man with a gun on Hamilton
6 Avenue.
7 Q. Okay. Did he tell you at all how it
8 was he received that information?
9 A. Yes. The information came from one
10 of his informants.
11 Q. Okay. Do you know which informant it
12 was?
13 A. I had some dealings with him, but
14 nothing too specific.
15 Q. Do you know who it is?
16 A. Yes.
17 Q. Can you tell me who it is?
18 MR. DIDONATO: No. Not absent to
19 court order.
20 MR. BAIRD: Okay. That's an
21 objection?
22 MR. DIDONATO: That's an objection.
23 And I'm going to go and instruct him not to
24 answer. We will produce it if there's a
25 court order, but he's involved in ongoing

## Page 17

1 investigations with not only the TPD but
2 also has had involvement with the State
3 Police Department, so I have no
4 authorization from either department to
5 release his personal identification.
6 MR. BAIRD: Okay. With that
7 objection on the record, I'm going to ask
8 him some other information about that
9 particular communication and the CI without
10 his identifying information --
11 MR. DIDONATO: You can ask history,
12 subsequent history, whatever you would like.
13 MR. BAIRD: Fair enough.
14 BY MR. BAIRD:
15 Q. You mentioned that you had some
16 dealings with this particular CI in the past.
17 A. Yes.
18 Q. Had he ever given you information
19 personally which led to an arrest?
20 A. Before that time?
21 Q. Yes, before May 2nd of 2009.
22 A. No. Everything was through Detective
23 Miles.
24 Q. Okay. Had you ever met with him
25 face-to-face prior to May 2nd, 2009?

## Page 18

```
1       A    One time.
2       Q    Okay.  Can you tell me the
3   circumstances surrounding that?
4       A    He was providing Detective Miles with
5   information and we were together.
6       Q    Okay.  What's your knowledge as to how
7   this particular CI would pass information to
8   Detective Miles in general?
9       A    He would call him.
10      Q    Okay.  Do you know how this particular
11  CI provided information concerning Mr. Williams?
12      A    He called Detective Miles.
13      Q    Okay.  And did Detective Miles tell you
14  about the person with the gun?
15      A    Yes.
16      Q    Okay.  In as much specificity as you
17  can, can you tell me exactly what Detective Miles
18  said to you on the phone that night?
19      A    He said that he had received a phone
20  call regarding a man with a gun on Hamilton
21  Avenue, gave me the description as it was provided
22  to him, and told me where he would be located.
23      Q    Okay.  And what was the description
24  that he gave of the person?
25      A    Okay.
```

## Page 19

```
1       A    He gave a very specific description.
2   I cannot recall the exact description, but I know
3   the description he gave was to a tee.  It's
4   provided -- it's in my police report if you want
5   the specifics if I could review that.
6       Q    Okay.  So it would be fair to say that
7   you would rely on the information that you placed in
8   your police report; is that right?
9       A    Yes.
10      Q    My understanding is that you drafted --
11  you prepared the affidavit for a warrant; is that
12  right?
13      A    Yes.
14      Q    Okay.  And it's also my understanding
15  that subsequent to Mr. Williams' arrest, Detective
16  Miles also provided a report concerning his
17  knowledge as to what occurred that night; is that
18  true?
19      A    I'm not sure.
20      Q    Okay.  And is it fair for me to say
21  that you would rely upon the description that you
22  placed in your police report to accurately describe
23  what Sean Miles told you about the suspect?
24      A    Yes.
25      Q    Okay.  And do you remember where
```

## Page 20

```
1   Detective Miles told you that the suspect would be?
2       A    There were several phone calls.  The
3   first phone call stated that he was in the liquor
4   store on Hamilton Avenue in the 500 block.
5       Q    Okay.
6       A    I don't recall the name of the liquor
7   store.
8       Q    In Trenton?
9       A    In Trenton, yes.
10      Q    Okay.  And do you recall approximately
11  when the first phone call came to you?
12      A    No, I don't.
13      Q    But it was nighttime, correct?
14      A    Yes.
15      Q    You were working the night shift?
16      A    Yes.
17      Q    And your shift back then was from --
18  can you tell me what the night shift was?
19      A    From 5:00 p.m. to 3:00 a.m.
20      Q    Okay.  During the first telephone
21  call -- correct me if I'm wrong -- Sean Miles
22  advises you that he has information concerning a
23  suspect who has a gun; is that true?
24      A    Yes.
25      Q    Okay.  And then he provided you with a
```

## Page 21

```
1   description of that suspect as well as an initial
2   location as to where that person was?
3       A    Yes.
4       Q    Okay.  And that initial phone call?
5       A    Yes.
6       Q    500 block of Hamilton Avenue; is that
7   right?
8       A    Yes.
9       Q    About how long after that first phone
10  call did the subsequent phone call occur?
11      A    Within five to seven minutes.
12      Q    Okay.  Do you remember where you were
13  when you received the initial phone call?
14      A    I was on Chambers Street in Trenton.
15      Q    Were you in your patrol vehicle?
16      A    Not a patrol vehicle.  We were
17  operating seized vehicles, so they were just every
18  day vehicles that we were -- that we had at our
19  disposal.
20      Q    Were these unmarked cars?
21      A    Yes.
22      Q    Okay.  Were you in plain clothes?
23      A    Yes.
24      Q    Okay.  And you were on Chambers Street
25  in an unmarked vehicle; is that accurate?
```

## Page 22

1   Q   Okay. After getting the initial phone
2   call, did you make any effort to go to the 500 block
3   of Hamilton Street to find the suspect?
4   A   Yes, I did. After I contacted
5   Detective Ward and Francevich, gave them the
6   information and the three of us proceeded to the
7   area.
8   Q   Okay. Were Detective Ward and
9   Francevich in the same car as you?
10  A   No.
11  Q   Were they operating in the same area
12  around Chambers Street as you were?
13  A   Yes.
14  Q   Okay. Did you provide them with this
15  information that was relayed to you by Detective
16  Miles over the radio or in person?
17  A   Cell phone.
18  Q   Okay. Was this your own personal cell
19  phone?
20  A   No. We had department issued cell phones
21  at the time.
22  Q   Okay. And when you were speaking with
23  Detectives Ward and Francevich, tell me what you
24  talked to them about after the initial call?
25  A   After the initial call, after giving

## Page 23

1   them the description and the area where we were
2   going to set up.
3   Q   Okay. Where was your original plan
4   after the initial call to set up?
5   A   We were going to have one officer
6   watch -- or one detective watch Hamilton and
7   Franklin at that corner there, another one at
8   Hamilton and Chambers because the location that
9   was given to us was in between those two
10  locations.
11  Q   Okay. After the initial call, did you
12  have any information about the identity of the
13  suspect other than a physical description?
14  A   No, I didn't.
15  Q   Okay. Did you know his name was Guy
16  Williams?
17  A   No.
18  Q   Okay. Did you have any knowledge as to
19  whether he was a -- whether he had a criminal
20  history at all?
21  A   No.
22  Q   Okay. Did Detective Miles give you any
23  information along those lines as to either criminal
24  history or identification by name?
25  A   No.

## Page 24

1   Q   Now, the second call comes in about
2   five to seven minutes. Had you and the other
3   officers already set up in your location at that
4   time?
5   A   We were still proceeding. We were
6   just trying to get to the area.
7   Q   Okay. And was it Detective Miles who
8   called you during that second phone call?
9   A   Yes.
10  Q   Okay. And what did he say?
11  A   He stated that the individual we were
12  looking for was now in the Chinese Food restaurant
13  which is called Food King.
14  Q   Okay. He was now at the Food King.
15  And how did Sean Miles come by that information?
16  A   He had received a phone call from his
17  informant.
18  Q   Do you have any knowledge as to how his
19  informant knew the very specific whereabouts of
20  Mr. Williams on that date?
21  A   No.
22  Q   Okay. At the time did you have any
23  knowledge as to how this CI was obtaining this very
24  specific information concerning Mr. Williams'
25  whereabouts?

## Page 25

1   A   No.
2   Q   Okay. Sitting here today, do you know
3   how he knew where Mr. Williams was at the time?
4   A   No.
5   Q   Okay. Do you know whether Mr. -- or,
6   excuse me, do you know whether Detective Miles was
7   following or had identified Mr. Williams and was
8   tracking his movements visually?
9   A   No, he wasn't. He was on his night
10  off.
11  Q   Okay. Did you know where Detective
12  Miles happened to be on his night off? Did he tell
13  you, hey, I'm at my house, I'm with my wife,
14  anything like that?
15  A   No.
16  Q   Okay. Did you have any knowledge as to
17  where Detective Miles was at the time he was making
18  those phone calls to you?
19  A   No.
20  Q   Okay. Sitting here today, do you have
21  any knowledge as to where Detective Miles was at the
22  time he was making those phone calls to you?
23  A   No.
24  Q   Okay. Did Detective Miles relay any
25  further information to you other than the fact that

## Page 26

1  Mr. Williams was now in the Food King?
2  A    No.
3  Q    What did you do after you got that
4  second phone call?
5  A    I notified Detective Ward and
6  Francicevich and then we met up in the area of
7  Hamilton and Franklin and made the approach.
8  Q    Okay. Were you at the corner of
9  Hamilton and Franklin?
10  A    No.
11  My car was on Franklin Street.
12  Q    Okay. And how far away from your car
13  was the Food King?
14  A    An approximation is 40 to 50 yards.
15  Q    Okay. Did you and Detective Ward and
16  Detective Francicevich meet up near your vehicle or
17  one of their vehicles?
18  A    we met as we were all walking towards
19  the Food King.
20  Q    Okay. And did you ever see
21  Mr. williams outside of the Food King?
22  A    No.
23  Q    And I'm talking about when you
24  initially approached, just so we're clear, okay?
25  A    Okay.
    Q    Tell me what you did next after you met

## Page 27

1  up and you were walking towards the Food King?
2  A    It took us -- after receiving the
3  call, informing them, I put on my police
4  identifiers: My vest -- my vest says police --
5  badge around the neck, we meet up. Detective
6  Francicevich and I entered the Food King first with
7  Detective Ward behind us.
8  Q    Did you have your weapons deployed at
9  the time you entered?
10  A    No.
11  Q    And what was Detective Ward doing at
12  the time?
13  A    She was walking in behind us.
14  Q    Okay. So all three of you officers
15  went inside the Food King; is that accurate?
16  A    Yes.
17  Q    Okay. And then what did you do?
18  A    Detective Francicevich went up to --
19  well, we saw a gentleman sitting in a chair
20  obviously waiting for food who fit the exact
21  description that I had been given.
22  Detective Francicevich approached him
23  on his right side, secured his right hand. I
24  approached the suspect on his left side, secured
25  his left hand, told him we need to speak to you

## Page 28

1  outside, got him up out of his chair and walked
2  him outside.
3  Q    Okay. Was Mr. Williams eating at the
4  time?
5  A    No.
6  Q    Okay. Had he gotten his food yet?
7  A    No.
8  Q    What did Mr. Williams do when you --
9  after you secured his arms and advised him that you
10  needed to talk to him outside?
11  A    He walked outside with us.
12  Q    Okay. Did he say anything to you from
13  getting up out of the table to walking outside?
14  A    Not at that point, no.
15  Q    Okay. Did you two officers say
16  anything to him from the time you secured his arms,
17  said we need to talk to you outside and then walked
18  him outside?
19  A    Not that I recall.
20  Q    Okay. How far was it, if you can
21  remember, from the table to the door of the Food
22  King to take him outside?
23  A    Twenty to 25 feet.
24  Q    Okay. Was there anyone else in the
25  Food King at that time?

## Page 29

1  A    Yes.
2  Q    Okay. Were there people eating?
3  A    I don't recall if they were eating.
4  There were other customers as well as the workers.
5  Q    Can you give me an approximation how
6  many customers there were in there?
7  A    No.
8  Q    Okay. Do you know what time of night
9  it was when you effectuated this arrest?
10  A    No. I can just recall that it was
11  dark.
12  Q    Okay. And what happened once you took
13  Mr. williams outside?
14  A    He was placed in a pat frisk position
15  and I began to perform a pat frisk on him.
16  Q    Okay. Is there any reason why you
17  performed the pat frisk outside versus inside the
18  Food King?
19  A    Because there were other patrons
20  inside. In case there was a confrontation, we
21  wanted to get him away from everyone else.
22  Q    Okay. Were you the only detective who
23  was performing the pat frisk?
24  A    Yes.
25  Q    Okay. Where was Detective Ward at this

Page 30

1 time?
2      A      Detective Ward was behind me.
3      Q      Detective Franicevich was still holding onto
4 Mr. Williams.
5      Q      Did you handcuff Mr. Williams at that
6 time?
7      A      No.
8      Q      Okay. What happened next?
9      A      I was performing a pat frisk and I
10 felt what was obviously a weapon in his pants
11 pocket.
12      Q      Okay. And in which pocket was it?
13      A      I believe it was his right front
14 pants pocket.
15      Q      Okay. And did Mr. Williams say
16 anything to you from the time you took him outside
17 until performing the pat frisk and feeling an object
18 which you stated was obviously a weapon?
19      A      He told me he had a gun.
20      Q      Okay. And when did he say that
21 specifically?
22      A      Before I had actually patted his
23 pocket while I was performing the pat frisk.
24      Q      Okay. And how long did it take the
25 frisk, did you start up around his chest or down by

Page 31

1 his ankles?
2      A      Top to bottom and worked my way down.
3      Q      Okay. Did he specifically say "I have
4 a gun"?
5      A      Yes.
6      Q      Did he say anything else that you can
7 remember?
8      A      Not that I can recall.
9      Q      Okay. And what did you do next?
10      A      I continued my pat frisk. After I
11 discovered the weapon, removed it from his pocket
12 and secured him -- or secured the weapon.
13      Q      Okay. How did you secure the weapon?
14      A      unloaded it and made sure it was
15 safe.
16      Q      Okay. And what kind of weapon was it?
17      A      It was a .22 caliber revolver.
18      Q      And then what did you do?
19      A      He was handcuffed. I don't recall
20 who handcuffed him, either Detective Ward or
21 Franicevich.
22      Q      At any time did Mr. Williams resist?
23      A      No.
24      Q      Okay. Did Mr. Williams say anything to
25 you after you secured the weapon?

Page 32

1      A      Nothing that I can recall
2 specifically.
3      Q      Do you remember him having any
4 conversations with either Detective Ward or
5 Detective Franicevich that you could hear?
6      A      Nothing that I could hear.
7      Q      Okay. Was Mr. Williams placed in a
8 police vehicle?
9      A      Yes. We called for a transport
10 vehicle to transport him into headquarters.
11      Q      Okay. And how long did it take the
12 transport vehicle to get there?
13      A      I don't recall.
14      Q      Okay. And I presume -- and correct me
15 if I'm wrong, please -- that Mr. Williams was then
16 turned over to whomever was driving the transport
17 vehicle, he was taken to the Mercer County or
18 Trenton jail and processed; is that accurate?
19      A      Yes, into Trenton police
20 Headquarters.
21      Q      Okay. Did you go back to Trenton
22 Police Headquarters to assist with the paperwork and
23 processing of Mr. Williams?
24      A      Yes.
25      Q      Okay. Did you go back to the Trenton

Page 33

1 Police immediately?
2      A      Yes.
3      Q      Okay. Did you have any conversations
4 with Mr. Williams at the police station?
5      A      Conversations for processing
6 purposes.
7      Q      Okay. Name, address, phone number,
8 things like that?
9      A      Yes.
10      Q      Okay. Did you make any effort to
11 determine whether Mr. Williams had any outstanding
12 warrants?
13      A      Yes.
14      Q      Did he?
15      A      I don't recall.
16      Q      Okay. Did you make any effort to
17 question Mr. Williams about the weapon that he had?
18      A      Not that I can recall, no.
19      Q      Okay. Did you inspect the weapon when
20 you removed it from Mr. Williams' person and then
21 secured it?
22      A      Yes.
23      Q      Okay. Did you notice anything
24 remarkable about the gun?
25      A      Remarkable? It was in very poor

Page 34

1   condition. That's --
2   Q   Okay. All right. Do you know whether
3   it could be operated?
4   A   That I don't know.
5   Q   Okay. Can you describe it in any more
6   specificity to tell me about what the poor condition
7   of it was?
8   A   The cylinder was held in place -- I
9   don't even know what held it in place, but it
10  wasn't an original part of the weapon. It was a
11  piece that had been replaced, kind of makeshift,
12  to hold the cylinder in place.
13  Q   Okay. Is there anything else you can
14  remember about it to describe the poor condition?
15  A   No.
16  Q   Okay. Can you tell me anything about
17  the conversation that you had with Mr. Williams at
18  the police station?
19  A   Nothing that I can recall.
20  Q   Okay. And how long did it take for you
21  to get him all processed?
22  A   The processing in general takes an
23  hour, hour and a half.
24  Q   Okay.
25  A   And that's just processing the

Page 35

1   prisoner and the weapon and then the report
2   writing is done after that.
3   Q   Okay. So the hour and a half is the
4   processing of the prisoner and the weapon itself?
5   A   Yes.
6   Q   Okay. And then to perform your report,
7   you would -- that would take an additional amount of
8   time?
9   A   Yes.
10  Q   Did you prepare your report that night?
11  A   Yes.
12  Q   Did you prepare it prior to going back
13  out onto the street, if you even did go back on the
14  street?
15  A   It was prepared prior to going back
16  out on the street. Whether we went back out, I
17  don't recall.
18  Q   Okay. And are you stating that because
19  that is your usual pattern and practice for
20  preparing reports is to do the paperwork immediately
21  after doing an arrest?
22  A   Yes.
23  Q   Okay. Did you have any conversations
24  with Detective Miles while you were preparing the
25  report concerning the arrest?

Page 36

1   A   No.
2   Q   Did you have any other conversations
3   with Detective Miles that night other than the two
4   phone calls that we talked about?
5   A   Yes.
6   Q   Okay. Tell me about the other contacts
7   you had with him.
8   A   After we had arrested Mr. Williams, I
9   called him to tell him that, you know, the
10  information had panned out.
11  Q   Okay. Did you at any time ask
12  Detective Miles anything about the reliability of
13  that particular CI?
14  A   No.
15  Q   Did you have any knowledge prior to
16  that night about the reliability of that particular
17  CI?
18  A   Yes.
19  Q   Tell me about that knowledge.
20  A   He had provided us with information
21  that we used to execute search warrants where
22  weapons and drugs had been seized.
23  Q   Okay. And at that time did you have
24  any knowledge as to whether that particular CI had
25  ever provided either you or Detective Miles with any

Page 37

1   bad information?
2   A   No.
3   Q   You didn't know one way or another or
4   had he ever provided Detective Miles with bad
5   information?
6   A   I don't know if he had ever provided
7   Detective Miles with bad information, no.
8   Q   Okay. Have you personally used this CI
9   for information since the arrest of Mr. Williams?
10  A   Yes.
11  Q   Okay. How many times since the arrest?
12  A   Approximately two dozen.
13  Q   Okay. And in that two dozen times, has
14  his information always yielded either an arrest or
15  contraband?
16  A   Yes.
17  Q   So in information he's provided to you
18  since the arrest of Mr. Williams, he has been
19  100 percent accurate?
20  A   As far as illegal activities, yes.
21  Q   Okay.
22  A   Quantities or amounts are always --
23  you know, nothing very accurate. Nothing
24  specific. If he said 14 pounds, which he did at
25  one point, it was 15 pounds, so he was off. So it

## Page 38

1  was never spot on to the ounce.
2  Q.  Okay.  And is this 15 pounds of weed?
3  A.  Yes.
4  Q.  Okay.  Do you know how he comes by this
5  information?
6  A.  No, I don't.
7  Q.  Have you ever asked him?
8  A.  No, I don't.
9  Q.  Okay.  Is there any reason why you've
10 never asked him?
11 A.  That's his dealings to what he does.
12 Once he provides me with the information, I'll
13 pick it up from there.
14 Q.  Okay.  Do you have any knowledge
15 whether he is involved in criminal activities or
16 enterprises, this particular CI?
17 A.  This particular CI, as far as I know
18 he is not.
19 Q.  Okay.  So would it be accurate to say
20 that it is not your belief -- this is going to be a
21 butchered question, I can tell already.  So this
22 isn't him dimming out other -- his other
23 competition; is that accurate?
24 A.  That's very accurate.
25 Q.  Okay.  Did you have any involvement

## Page 39

1  with Mr. Williams prior to his arrest on May 2nd?
2  A.  No.
3  Q.  Had you ever seen him before?
4  A.  Not that I can recall.
5  Q.  Okay.  How about subsequent to his
6  arrest?  I would like you to tell me about any and
7  all contacts that you've had with Mr. Williams after
8  May 2nd, 2009.
9  A.  The only other time I saw him was in
10 court at the suppression hearing.
11 Q.  Okay.  Did you ever see him prior to
12 that at a preliminary hearing?
13 A.  Not that I can recall, no.
14 Q.  Okay.  Did you have any conversations
15 with detective Miles about his preparation of a
16 report that was utilized by the lawyers at the
17 suppression hearing?
18 A.  No.
19 Q.  Do you have any input into that report
20 at all?
21 A.  No.
22 Q.  Did you review it before going to the
23 suppression hearing?
24 A.  No.
25 Q.  Okay.  And then at the suppression

## Page 40

1  hearing, the judge ruled that the gun itself was
2  inadmissible; is that right?
3  A.  Yes.
4  Q.  Do you know whether Sean Miles was ever
5  arrested for any reason?
6  A.  Yes, I do.
7  Q.  Why was he arrested?
8  A.  For domestic violation.
9  Q.  Was that once or more than once?
10 A.  I believe it was just once.
11 Q.  Okay.  Do you know what the outcome of
12 that arrest was?
13 A.  No.  I bailed him out, but I don't
14 recall exactly what happened with the court case.
15 Q.  Okay.  Do you know whether Trenton
16 Police took any disciplinary action against him for
17 that?
18 A.  I don't know.
19 Q.  Okay.  Do you know who lives at 116
20 Rushing Street in Trenton?
21 A.  That currently is a vacant boarded up
22 residence.
23 Q.  You were involved in an internal
24 affairs investigation concerning allegations that
25 there was an officer at 116 Rushing Street buying

## Page 41

1  drugs.
2  Q.  Do you remember that?
3  A.  Yes.
4  Q.  Okay.  What was the outcome of that
5  investigation?
6  A.  That, as far as I know, was not
7  sustained.
8  Q.  Okay.  And that was bad information,
9  then, that was received by those dispatchers,
10 correct?
11 A.  That was information that the
12 department deemed to be bad information.
13 Q.  Okay.  And you were not disciplined
14 whatsoever for your role in that investigation,
15 correct?
16 A.  Yes, I was because I went into the
17 radio room and listened to the tape call.
18 Q.  And what was the discipline that you
19 received?
20 A.  That they held an abeyance, I think.
21 I'm not sure.
22 Q.  What does that mean exactly?
23 A.  It means if there's another -- I
24 don't get a day off, but if something else
25 happens, then they can give me that day off.

## Page 42

```
 1      Q    Okay.  Without pay?
 2      A    Without pay.
 3      Q    Did you ever have any CI who resided at
 4   116 Rushing Street?
 5      A    Yes.
 6      Q    Okay.  Do you know whether this was the
 7   same person who provided this bad information?
 8      A    I don't believe it was.
 9      Q    Okay.  Have you ever been sued before
10   in your -- in association with your work as a police
11   officer?
12      A    I believe I was a long time ago.  My
13   first time around with the Trenton police
14   Department.  I don't recall what for, though.
15      Q    Okay.  Do you remember what the outcome
16   of that lawsuit was?  Did you go to trial, for
17   example?
18      A    No.
19      Q    Okay.  And was that the matter in which
20   you had previously testified here today that you had
21   attended your deposition in that case?
22      A    I don't recall.
23      Q    Okay.  But you had given deposition
24   testimony before; is that right?
25      A    Yes.
```

## Page 43

```
 1      Q    Okay.  Do you remember what the case
 2   was in which you provided deposition testimony?
 3      A    No, I don't.
 4      Q    Were you a party to that case, meaning,
 5   were you either the plaintiff or the defendant?
 6           MR. DIDONATO:  You mean in the case
 7      where he was deposed?
 8           MR. BATRO:  Yeah, yeah.
 9      A    I don't recall.  I don't believe I
10   was but I don't recall specifically.
11   BY MR. BATRO:
12      Q    Okay.  Do you know approximately how
13   long ago it was that you gave deposition testimony?
14      A    It would have to be prior to 1994
15   when I left Trenton.
16           MR. BATRO:  Okay.  I'm going to hand
17      you a document that I would like to have
18      marked as Lugo-1.
19           (At this time, Lugo-1 was
20      marked for identification.)
21   BY MR. BATRO:
22      Q    Take your time reviewing it and just
23   let me know when you're ready because I would like
24   to ask you a couple of questions about it.
25      A    (Witness complies.)
```

## Page 44

```
 1      Q    Can you tell me what this document is?
 2      A    Affidavit of Probable Cause.
 3      Q    And this is the document that -- did
 4   you prepare this?
 5      A    This was prepared by Detective Ward
 6   and given to me to review and sign.
 7      Q    Okay.  And can you tell me when this
 8   was prepared by Detective Ward in reference to the
 9   events surrounding the arrest of Mr. Williams?
10      A    To expedite time.  We would all do
11   proceeded into the headquarters after the arrest.
12      Q    And is there any reason why Officer
13   Ward prepared it and then gave it to you to sign?
14      A    This was prepared after we all
15   different parts of the paperwork.
16      Q    Okay.  And is that your signature
17   there?
18      A    Yes.
19      Q    Okay.  And underneath the signature, do
20   you know whose signature that is?
21      A    I don't know.
22      Q    It looks like a notary stamp, I guess?
23      A    No, that's a lieutenant.
24      Q    Okay.  That's a lieutenant, all right.
25   Now, this is an Affidavit of Probable
```

## Page 45

```
 1   Cause.  Is there a particular purpose why you
 2   prepared this document after Mr. Williams had
 3   already been arrested?
 4      A    At this point it's reviewed to make
 5   sure we have all of the criteria to fit the
 6   charge.
 7      Q    Okay.  And reviewing it, you had a
 8   chance to read it over, is there anything in there
 9   that is inaccurate or that you do not believe is
10   true now sitting here several years later?
11      A    I don't recall seeing him walking on
12   Franklin Street towards Hamilton Avenue.
13      Q    Okay.  Do you know whether Ms. Ward
14   observed him walking on Franklin Street?
15      A    No, I don't.
16      Q    Okay.  Do you know whether Detective
17   Francicevich had ever observed Mr. Williams walking
18   down Franklin towards Hamilton?
19      A    No.
20      Q    Okay.  Do you know whether --
21           MR. DIDONATO:  Just for the record, I
22      think the document marked as Lugo-1 actually
23      indicates he was walking down Hamilton
24      towards Franklin which is the opposite of
25      what you just indicated.
```

Page 46

```
 1          MR. BAIRD:  Okay.  The tip further
 2  explained that the -- and I'm reading from
 3  Lugo-1 -- the tip further explained that the
 4  black male was walking down Franklin Street
 5  heading towards Hamilton Avenue --
 6          MR. DIDONATO:  And then if you look
 7  further in the paragraph, that's where I
 8  got confused, I apologize.
 9          MR. BAIRD:  All right.
10  BY MR. BAIRD:
11      Q   Is there anything else besides that
12  that you, sitting here today, you believe is
13  inaccurate or incorrect?
14      A   Well, it doesn't state where he was
15  actually -- where he actually was.  He was
16  actually in the Chinese restaurant.  If you read
17  it, it leads you to believe that he was
18  approached while he was on Hamilton Avenue.
19      Q   Okay.  Anything else that you believe
20  to be inaccurate or in any way wrong?
21      A   Identified ourselves as police
22  officers, stated he had the gun in his front
23  pocket.  This was done after we had already taken
24  control of him and taken him out of the
25  restaurant.
```

Page 47

```
 1      Q   Okay.  And did you review this on the
 2  night of May 2nd, 2009?
 3      A   Yes, I did but not very well.
 4      Q   Okay.
 5          MR. BAIRD:  This I'll have marked as
 6  Lugo-2.
 7          (At this time, Lugo-2 was
 8  marked for identification.)
 9          MR. DIDONATO:  The incident
10  investigation report is four pages.
11          MR. BAIRD:  Okay.
12          MR. DIDONATO:  Let's take a quick
13  break.
14          MR. BAIRD:  Okay.
15          (Whereupon, a short recess was taken,
16  after which time the deposition resumed.)
17  BY MR. BAIRD:
18      Q   Take as much time as you need in
19  reviewing this.  I'm going to ask you a few
20  questions about it.
21      A   Okay.
22      Q   Can you tell me what this is?
23      A   This is my police report.
24      Q   And this is from the arrest of
25  Mr. Williams that occurred on May 2nd, 2009?
```

Page 48

```
 1      Q   Okay.  Now, if you look at page three,
 2  there's a reporting officer narrative.
 3  Did you prepare this narrative?
 4      A   Yes.
 5      Q   Okay.  Did you have input from
 6  Detective Francevich or Ward when you were
 7  preparing this narrative?
 8      A   No.
 9      Q   Okay.  So in the Division of Labor that
10  you told me about concerning the paperwork, this is
11  your contribution?
12      A   Yes.
13      Q   Is there anything in here -- and you
14  can take as much time as you need, but let me know
15  if there's anything in here that now, sitting here
16  today, you believe is inaccurate or incorrect.
17      A   The only difference between this --
18  what I would consider a significant difference
19  between this and my testimony here today is who
20  took hold of which arm.  My reports states
21  Detective Francevich told hold of Williams' left
22  arm, where as I stated that I had taken hold of
23  his left arm.
24      Q   Okay.  Do you know which one is
25  accurate?
```

Page 49

```
 1      A   I would say that the report is
 2  accurate since it was done that night and it was
 3  still fresh in my memory.
 4      Q   Okay.  Now, in terms of the -- I would
 5  like you to look towards the middle of the page
 6  where it discusses the pat frisk of Mr. Williams.
 7      A   Yes.
 8      Q   Do you see where it says, "Once
 9  outside, he was pat frisked by myself"?
10      A   Yes.
11      Q   Okay.  And then it continues, "When I
12  felt his right front pocket through his pants, I
13  felt what I immediately recognized as a revolver.
14  As I was doing this, Williams stated 'I have a gun
15  on me.'"
16      A   Yes.
17      Q   Is that accurate in terms of when
18  Mr. Williams alerted you to the fact that he had a
19  gun?
20      A   That would be accurate, yes.
21      Q   Okay.  Now, I apologize if I asked you
22  this before, but did you have any conversations with
23  Detective Miles about the arrest prior to the
24  suppression hearing?
25      A   No.
```

## Page 50

```
 1   Q    Okay.  Other than --
 2   A    Other than the phone call saying that
 3  we had made the arrest.
 4   Q    Okay.  Now, this is something that's
 5  been identified as a case supplemental report.  And
 6  I just want to ask you about this for identification
 7  purposes.
 8        Have you ever seen that before?
 9   A    No.
10   Q    Okay.
11        MR. DIDONATO:  Counsel, do you have
12        an objection if we had that marked as Lugo-3
13        just so the record is clear?
14        MR. BAIRD:  Yeah, I think we should.
15             (At this time, Lugo-3 was
16             marked for identification.)
17  BY MR. BAIRD:
18   Q    Okay.  And I'll ask my question one
19  more time.
20        Have you ever seen this before?
21   A    No.
22   Q    Okay, fair enough.  I just have a
23  couple more questions for you.
24        Have you ever been arrested for a
25  crime involving dishonesty?
```

## Page 51

```
 1   A    No.
 2   Q    Okay.  Just allow me a few minutes to
 3  review my notes and I think we're just about done.
 4   A    Okay.
 5   Q    Did you ever ask Mr. Williams at the
 6  time of his arrest where is the gun or where is it?
 7  Did you say anything like that to him?
 8   A    Not that I recall, no.
 9        MR. BAIRD:  Okay.  That's all I have.
10        I appreciate your time today.
11        MR. DIDONATO:  No questions.
12             (Deposition concluded.)
13             - - -
14             - - -
```

## Page 52

```
 1             C E R T I F I C A T I O N
 2
 3        I, Aubrey D. McNally, do hereby certify
 4  that the witness in the foregoing deposition was duly
 5  sworn to testify the truth, the whole truth and
 6  nothing but the truth in the within-entitled cause;
 7  that said deposition was taken at the time and place
 8  therein stated; that the testimony of said witness was
 9  reported by me, a Certified Shorthand Reporter and
10  Registered Professional Reporter, and was thereafter
11  transcribed under my direction into typewriting, and
12  that this is a true and correct transcript of same.
13        I further certify that I am not counsel
14  for, nor in any way related to any of the parties to
15  this suit, nor am I in any way interested in the
16  outcome thereof.
17
18        --------------------------
19        Aubrey D. McNally, CCR, RPR
20        New Jersey Certification No. 30XI00234300
```

# TRENTON POLICE DEPARTMENT, NEW JERSEY
## PATROL BUREAU
## AFFIDAVIT OF PROBABLE CAUSE

CASE #: 09-007548
STATE OF NEW JERSEY)
COUNTY OF MERCER)

I, Det. K.Lugo #559, of full age, being duly sworn on his oath, according to law, deposes and says:

1. I am a duly constituted Police Detective of the Trenton Police Department.

2. I have probable cause to believe and do believe that the person know as Guy L. Williams, and more particularly described as follows:
B/M, 6'0" tall, and 225 lbs., Date of Birth: 03/07/1981,
Has committed and is wanted in connection with the offense(s) of: 2C: 39-5 Possession of a weapon, 2C: 39-7b Possession of a weapon by a convicted felon.

On May 2, 2009 at approximately 2130 hours we Units 562, 561, 564 received a confidential tip that a black male wearing an orange baseball cap and an orange and white long sleeve shirt was to be carrying a handgun. The tip further explained that the black male was walking down Franklin St. heading towards Hamilton Ave. Upon further investigation we observed a black male, later identified as Guy L. Williams, fitting the description given by the confidential informant walking down Hamilton Ave. towards Franklin St. As we approached G. Williams, and identified ourselves as Police Officers he stated that he had a handgun in his front pocket. Said weapon, .22 caliber RG14S, was confiscated and G. Williams was taken into custody.



Det. K. Lugo

(Signature)

Sworn and subscribed by me
This __2nd__ day of __May__, 20 _09_



# INCIDENT/INVESTIGATION REPORT

| Agency Name | Trenton Police Department | | | Case# | 09-007548 |
|---|---|---|---|---|---|
| ORI | NJ 0111100 | | | Date / Time Reported | 05/02/2009  21:50 Sat |
| | | | | Last Known Secure | 05/02/2009  21:30 Sat |
| Location of Incident | 539 Hamilton Ave, Trenton NJ 08611- | | Premise Type Restaurant | At Found | 05/02/2009  21:50 Sat |
| | | | | Zone/Tract E1, E | Activity |

| #1 | Crime Incident(s) Unlawful Possession Of Weapons(s) (handgun) - State Of New Jersey | (Com) F | Weapon / Tools REVOLVER | Entry | Exit | Security | Activity |
| #2 | Crime Incident Certain Persons Not To Have Weapons 2C:39-5B | (Com) F | Weapon / Tools | Entry | Exit | Security | Activity |
| #3 | Crime Incident Warrant/fp Trenton WARRANT FTP | (Com) | Weapon / Tools | Entry | Exit | Security | Activity |

| MO | | | | | | | | |

| # of Victims  1 | Type: SOCIETY/PUBLIC | | Injury: | | | | | |

| V1 | Victim/Business Name (Last, First, Middle) State Of New Jersey | | | Victim of Crime # 1,2,3 | Age | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | | | | | |
| Employer Name/Address | | | | | Business Phone | | | | Home Phone | | |

| VYR | Make | Model | Style | Color | Lie/Lis | | | VIN | | | |

| CODES: V- Victim (Denote V2, V3)  O = Owner (if other than victim)  R = Reporting Person (if other than victim) | | | | | | | | | | | |

| Type: | | | | Injury: | | | | | | | |
| Code: | Name (Last, First, Middle) | | | Victim of Crime # | Age | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | | | | | |
| Employer Name/Address | | | | | Business Phone | | | | Home Phone | | |

| Type: | | | | Injury: | | | | | | | |
| Code: | Name (Last, First, Middle) | | | Victim of Crime # | Age | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
| Home Address | | | | | | | | | | | |
| Employer Name/Address | | | | | Business Phone | | | Mobile Phone | | | |

CODES:  1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
"O" = Recovered for Other Jurisdiction

| | V1 Code Frm/To | Status | OJ | QTY | Property Description | | | Make/Model | Serial Number | Value |
|---|---|---|---|---|---|---|---|---|---|---|
| | 13 | EVID | 01 | 1 | 1 FIREARMS | | | 22/RGRg14s | 2140664 | $0.00 |

| Officer/ID# | Luco, Kenneth (NDST, ORT) (5751) | Case Status Cleared By Arrest | Case Disposition: Closed | Supervisor Asbury, Jason C (SDST, FSPR) (5292) |
| Invest ID# | (0) | | | |
| Complainant Signature | | 07/13/2009 | | |
| Printed By: 5751, UNT087 | | | | Sys# 11985 |

Δ π EXHIBIT 2
Deponent Lugo-2
6/19/12  Rpt 41M
Date
WWW.DEPOBOOK.COM

**Trenton Police Department**

**INCIDENT/INVESTIGATION REPORT**
Page 2

By: 5751, UN0087     08/12/2009 10:06

Case# 09-007548

| Status Codes | 1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown |
|---|---|

| | IBR | Status | Quantity | Type Measure | Suspected Type | Up to 3 types of activity |
|---|---|---|---|---|---|---|
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |

Assisting Officers
RENNA, V.L. (6150),  CROSBY, M. (2954)

Suspect Hate / Bias Motivated:

NARRATIVE

# REPORTING OFFICER NARRATIVE

**Trenton Police Department**

| | OCA |
|---|---|
| | 09-007548 |

| Victim | Offense | Date / Time Reported |
|---|---|---|
| Society | *UNLAWFUL POSSESSION OF WEAPON(S)* | Sat 05/02/2009 21:50 |

THE INFORMATION BELOW IS CONFIDENTIAL, FOR USE BY AUTHORIZED PERSONNEL ONLY

Additional Officers: Det. C. Franicevich, Det. Y. Ward, Det. S. Miles, Off. M. Crosby, Off V. Rema

At approximately 2125 hrs, 05/02/2009/I received a phone call from Det. Sheehan Miles who stated that a CI had contacted him and advised him that there was a man with a gun in his possession walking in the 500 block of Hamilton Ave. The CI described the man as a B/M wearing an orange hat with the letter H on it, a long sleeve orange shirt with a white t-shirt over it and jeans. I then contacted Detectives Franicevich and Ward and we proceeded to the area to look for the described individual. Detectives Franicevich and Ward were together in an unmarked undercover vehicle and I was in another unmarked undercover vehicle. While I was proceeding to the area I remained in contact with Det. Miles who advised me that he received another call from the CI telling him that the male was in the liquor store on Hamilton Ave near Chambers St and that he would be proceeding back to Franklin St when he left the liquor store. I was on Franklin St when Det. Franicevich advised me that he had a visual of the B/M, later identified as Williams, and that he was walking on Hamilton Ave and had just entered the Food King Chinese restaurant, 539 Hamilton Ave. While Williams was waiting for his food Det. Franicevich and I entered the restaurant and approached him. Det. Franicevich took hold of Williams left arm and I took hold of his right arm and we led him out of the restaurant. Once outside he was pat frisked by myself. When I felt his right front pocket through his pants I felt what I immediately recognized as a revolver. As I was doing this Williams stated, "I have a gun on me." I then removed the revolver from his pocket as Det. Franicevich and Det. Ward handcuffed Williams and placed him under arrest. A continued search incident to arrest was negative for any further contraband. The revolver was made safe and found to be fully loaded with six (6) .22 cal bullets.

Williams was transported into headquarters by officers Crosby and Rema. A warrant check was conducted and Williams was found to have an active Trenton warrant. He was then docketed for the listed charges and turned over to detention personnel for continued arrest processing.

The revolver was found to be clear lost or stolen and was turned in as evidence and placed in the North Division evidence drop box.

At this time I have nothing further to add to this report

Reporting Officer: *LUGO, KENNETH*

Printed By: 5751, UN1087   08/12/2009 10:06

Page 3

# Trenton Police Department

## Incident Report Suspect List

OCA: 09-007548

**1**

| Name (Last, First, Middle) | | | | | | | | Also Known As | | Home Address |
|---|---|---|---|---|---|---|---|---|---|---|

**Williams, Gay Lloyd**

70 FRANKLIN ST
TRENTON, NJ 08609

Business Address

| DOB. | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State. |
|---|---|---|---|---|---|---|---|---|---|---|
| 03/07/1981 | 28 | B | M | N | 601 | 200 | BLK | BRO | DBR | 25 588 244 PA |

Scars, Marks, Tattoos, or other distinguishing features

*TATT LEFT FINGER / SPRAY CAN; TATT LEFT HAND / BRICK WALL WITH "WILL"*

### Reported Suspect Detail

| Suspect Age | Race | Sex | Height | Weight | SSN |
|---|---|---|---|---|---|

| Weapon, Type | Feature | Make | Model | Color | Caliber | Dir of Travel |
|---|---|---|---|---|---|---|

| Veh Yr/Make/Model | Drs | Style | Color | Lic/St | Mode of Travel | VIN |
|---|---|---|---|---|---|---|

Notes

Physical Char

Notes



**CASE SUPPLEMENTAL REPORT**

Printed: 12/02/2010 09:28

OCA: **09007548**

Trenton Police Department

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ARREST*  **Case Mng Status:** *NA*  **Occured:** *05/02/2009*

**Offense:** *UNLAWFUL POSSESSION OF WEAPON(S) (HANDGUN)*

**Investigator:** *MILES, SHEEHAN  (5663)*  **Date / Time:** *12/01/2010 20:28:21, Wednesday*

**Supervisor** *CARRIER, ROBERT W  (4132)*  **Supervisor Review Date / Time:** *12/01/2010 20:52:32, Wednesday*

**Contact:**  **Reference:** *Additional Information*

On 05/02/2009 at approximately 2120 hours I (Miles) was assigned to the Trenton Police Department, Quick Response Team, a successful team of undercover officers who focused their investigative attention on quality of life offenses in the City of Trenton that included low level drug and firearm offenses. At this time I was off duty when I recieved a telehone call from a confidential informant (hereinafter referred to as CI) who told me that there was an individual with a handgun walking on the 500 block of Hamilton Ave. CI described the individual as a black male, wearing an orange colored hat with the letter H on it and along sleeve orange shirt with a white T-shirt over it and jeans.

I immediately contacted undercover Detective Kenneth Lugo of the Trenton Police Department, QRT and advised him of the information provided by CI. Detective Lugo stated that he would proceed to the location and attempt to locate the suspect.

Shortly thereafter, I recieved another call from CI who stated that the suspect had walked to the liquor store on Hamilton Avenue, near Chambers street. I immediately advised Detective Lugo of the information.

Shortly thereafter, Detective Lugo advised me that he and Detective Franicevich arrested the suspect fitting the description provided by CI who was in possession of a handgun.

For further information regarding the arrest of the suspect see the investigation report submitted by Detective Lugo bearing this case number.

It should be noted that information provided by CI has been responsible for the arrest of numerous individuals for drug offenses and numerous individuals offenses involving firearms. As in this instance, previous information provided by CI has been accurate and up to date.