# EXHIBIT B

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MERCER COUNTY
IND. NO. 09-11-1101

THE STATE OF NEW JERSEY, )
vs. )
GUY WILLIAMS, )
Defendant. )

STENOGRAPHIC TRANSCRIPT
OF
MOTION TO SUPPRESS

PLACE: Mercer County Courthouse
209 South Broad Street
Trenton, New Jersey
DATE: April 11, 2011

B E F O R E:

HONORABLE EDWARD M. NEAFSEY, J.S.C.

Transcript Ordered By:

Graham F. Baird, Esquire
Weisberg Law, P.C.

A P P E A R A N C E S:

JOSEPH L. BOCCHINI, JR.,
PROSECUTOR - MERCER COUNTY
By: TIMOTHY P. WARD, ASSISTANT PROSECUTOR
For the State of New Jersey

E. AUSTIN BELMONT, ESQUIRE
(Office of the Public Defender)
For the Defendant

* * * * * * *

ROSEMARIE LEVANDOWSKI, C.C.R.,C.R.C.R.
Mercer County Courthouse
209 South Broad Street
Trenton, New Jersey 08650

I N D E X


| WITNESS | PAGE |
|---|---|
| KENNETH LUGO | |
| Direct by Mr. Ward | 4 |
| Cross by Mr. Belmont | 15 |
| SHEEHAN MILES | |
| Direct by Mr. Ward | 17 |
| Cross by Mr. Belmont | 27 |
| Redirect by Mr. Ward | 36 |
| ARGUMENT | |
| MR. BELMONT | 37 |
| MR. WARD | 44 |
| COURT'S DECISION | 50 |


E X H I B I T S


| NUMBER | DESCRIPTION | IDEN. | EVID. |
|---|---|---|---|
| S-1 | 12/1/2010 Police Report/Miles | 23 | |

THE CLERK: All rise.
THE COURT: Good afternoon. You may be seated.
All right. Counsel, are we ready on this motion?
MR. WARD: We are, your Honor.
THE COURT: All right. State versus Guy Williams. Your appearances.
MR. WARD: Good afternoon, your Honor. Assistant Prosecutor Timothy Ward for the state.
MR. BELMONT: E. Austin Belmont, Assistant Deputy Public Defender, on behalf of Mr. Williams, your Honor, seated in the jury box.
THE COURT: This is a warrantless search. The prosecutor has the burden. Call your witness, Prosecutor.
MR. WARD: Your Honor, the state calls Kenneth Lugo.
THE COURT: Kenneth Lugo.
THE CLERK: You do solemnly swear the testimony you're about to give the Court in this matter shall be the truth, the whole truth, and nothing but the truth so help you God?
THE DEFENDANT: I do.
K E N N E T H L U G O, STATE'S WITNESS, SWORN.



THE CLERK: Please state your name for the record.
THE WITNESS: Kenneth Lugo.
THE CLERK: Thank you.
THE COURT: Go ahead, Prosecutor.
MR. WARD: Thank you, your Honor.
DIRECT EXAMINATION BY MR. WARD:
Q Who are you employed by, sir?
A City of Trenton, Trenton Police Department.
Q And what is your current rank?
A Detective.
Q How long have you been a detective with the Trenton Police Department?
A Since September of 2008.
Q And prior to that, what was your rank?
A Officer.
Q How long were you an officer with the Trenton Police Department?
A I started in 1986, left in 1994. I was an officer in Arizona. And then I came back in 2003 and re-joined Trenton.
Q When you started in 1986 with Trenton as an officer, was that your first police department employment?
A Yes.

Q Now, were you employed by the Trenton Police Department back in May of 2009?
A Yes.
Q Do you recall what unit you were assigned to at that time?
A I was in the Quick Response Team.
Q What was the Quick Response Team?
A It was a unit that was formed to respond to citizen's complaints regarding narcotics, prostitution and something that, you know, we would get a call, we would go out and look at it.
Q Did the Quick Response Team engage in long-term investigations?
A We had always said if it was going to take more than a week, we really didn't want to take part in it, that it was probably something better suited for our vice unit.
Q Now, how would the Quick Response Team typically go about receiving information that would lead to investigations?
A Phone calls from citizens; things would come into Tipsoft, which is an anonymous phone line. And the Vice Enforcement Unit, if they didn't think it was something that they needed to handle, they would send it us, or from citizen complaints or from informants.



Q When you say informants, are you referring to confidential informants?
A Yes, sir.
Q Just briefly describe, so the record is clear, what you mean by a confidential informant.
A Confidential informant is someone who wishes to remain anonymous, but will make phone calls and give information on individuals who may be carrying narcotics or houses where narcotics are being sold, prostitution, just different types of crimes.
Q I'd like to refer your attention to May 2nd of 2009, at approximately 9:25 p.m. Were you on duty at that time?
A Yes, I was.
Q And at around that time, did you receive a telephone call from Sheehan Miles?
A Yes, I did.
Q And who is Sheehan Miles?
A At the time he was my partner. He was also a detective.
Q And was he part of the Quick Response Team like you?
A Yes.
Q Was Miles on duty at that time?
A No, he wasn't.

Q Now, do you recall where you were when you received a phone call from Detective Miles?
A We were in our office, which is located in police headquarters.
Q On Clinton?
A Yes.
Q And when you received that phone call from Miles, what, if anything, did he tell you?
MR. BELMONT: Your Honor, I assume that this otherwise hearsay will be subject to Officer Miles coming in and testifying?
MR. WARD: It will.
MR. BELMONT: Then, on that basis, I won't object.
Q What did, then, Detective Miles tell you?
A He told me he had received a phone call from a confidential informant, informing him that there was a black male on Hamilton Avenue with -- who was carrying a weapon, carrying a gun.
Q Did he give you any additional information regarding that black male carrying a gun?
A He gave us a description of what he was wearing; baseball hat with a white "H" on it, a long-sleeve white shirt with an orange T-shirt over top of it and blue jeans.



Q Do you recall whether he told you what color the hat was that had the "H" on it?
A I believe he also said that was orange.
Q Now, when you received this information from Detective Miles, what, if anything, did you do?
A I informed Detectives Ward and Franicevich, who was also part of the Quick Response Team, and we proceeded out to the area.
Q And how did you get out to that area?
A We had unmarked vehicles that we drove in.
Q Now, before we go any further, Detective Lugo, when you were working the Quick Response Team, were you, as officers, in police uniform?
A No, we weren't.
Q What were you wearing?
A Just regular street clothes.
Q And I think you had mentioned unmarked units. Is there any particular reason why you would use unmarked units?
A So we could remain anonymous while we were driving around watching people.
Q Now, you indicated yourself, Detective Ward and Detective Franicevich; did you all go out there in the same car?

A No. I was by myself, and Detectives Ward and Franicevich were in another vehicle.
Q Now, after you left headquarters in the unmarked vehicles, where did you go?
A I proceeded down Chambers Street to Franklin Street, and Detectives Ward and Franicevich proceeded to Hamilton Avenue.
Q Where is Franklin Street in relation to Hamilton Avenue?
A Franklin Street and Hamilton Avenue intersect a block -- it is the first street over from Chambers Street.
Q So, then, if you were looking at a map, would Hamilton Avenue run in-between Franklin and then Chambers?
A Yes.
Q And when you arrived at the area, did you receive any additional information from Detective Miles?
A Yes, I did. I had received a phone call from Detective Miles stating that the black male in question had been in the liquor store and he was now proceeding back to Franklin Street.
Q Now, are you familiar with any liquor stores on Hamilton Avenue near Franklin Street?



A Yes.
Q Where is that located?
A That is located, I believe it's the third business in from Chambers Street as you're heading towards Franklin.
Q Now, after you received that information from Detective Miles, did you share that with Detective Franicevich?
A Yes, I did.
Q And how did you do that?
A Police radio.
Q And after that time, did there come an occasion where Detective Franicevich advised you of anything?
A Yes, he did.
Q And what was that?
A He advised me that he had a black male matching the description on Hamilton Avenue entering the Food King Chinese Restaurant.
Q Do you know where the Food King Chinese Restaurant is located?
A It's 539 Hamilton Avenue; that is also before you reach Franklin Street.
Q Now, do you recall approximately how long after you received word from Detective Miles that the

suspect had just left the liquor store, that Detective Franicevich advised you he had an eye on someone?

A This was approximately five minutes, maybe less.

Q When you received that information from Detective Franicevich, what, if anything, did you do?

A I parked my vehicle -- Well, I was already parked on Franklin Street. I put on my vest, which is marked "police." I put my badge around my neck. And I met with Detectives Franicevich and Ward on Hamilton Avenue so we could enter the Chinese restaurant.

Q Why did you put your vest on?

A To identify myself.

Q And how does that identify you?

A It is marked "police," it has a badge on it, it has my name on it, plus, I had my badge hanging around my neck.

Q Now, approximately, where did you meet Detectives Franicevich and Ward?

A I met them at the corner of Hamilton and Franklin.

Q And after you met with them, what, if anything, did you do?

A Detective Franicevich and I entered the restaurant and approached the individual matching the



description.

Q Now, when you walked into the restaurant --

Are we talking about the Food King?

A Yes.

Q Now, when you walked into the restaurant, can you describe the individual that you approached.

A Black male, perfect clothing description, orange hat with a white "H" on it, orange T-shirt, long-sleeve white shirt underneath, and jeans.

Q Was there anyone else in the Food King Chinese Restaurant dressed in that manner?

A Negative.

Q And where was this individual in the restaurant when you saw him?

A He was seated in a chair, waiting for his order.

Q What did you do when you saw him?

A Detective Franicevich and I approached him. Detective Franicevich took hold of his left hand; I took hold of his right hand and we walked out of the restaurant with him.

Q Did he offer any resistant at that time?

A No.

Q What happened once you got outside the restaurant?

A Once we got outside, we placed him in a pat-frisk

position. And while Detective Franicevich held on to his left hand, I started to a perform a pat frisk on him.
Q Now, why did you do a pat frisk?
A Based on the information given, that he had a weapon on him, I wanted to make sure he wasn't carrying anything that could be of danger to us.
Q And what, if anything, did you discover during the course of the pat frisk?
A Well, when I patted his right front pocket, I could feel what I immediately recognized as a revolver.
Q How were you able to recognize that?
A Just from my experience, I grabbed it, I manipulated it, and was able to tell what it was.
Q And as you were doing that, what, if anything, was the suspect doing?
A He turned his head to me and said "I have a gun on me."
Q And did you later learn the identity of that suspect?
A Yes, I did.
Q Who was that?
A Guy Williams.
Q What did you do after Mr. Williams said that he had a gun on him?



A I removed the weapon from his pocket. Detective Ward, then, stepped up and assisted Detective Franicevich in handcuffing Mr. Williams. And I made the weapon safe, opened up the cylinder and unloaded it.
Q And do you recall what kind of a gun it was?
A It was a .22-caliber revolver.
Q When you said that you made the gun safe and unloaded it, what did that involve?
A I removed the six live bullets that were in it.
Q What did you do with them?
A Placed them in my vest pocket.
Q And what did you do with the gun?
A I just held on to that.
Q And did there come a time when you left the scene of Hamilton Avenue?
A Yes. We called a patrol vehicle to transport Mr. Williams into headquarters. Officers Crosby and Renna responded; they transported him in. And then Detectives Franicevich, Ward, and I proceeded into headquarters to start our paperwork.
MR. WARD: Nothing else.
THE COURT: Mr. Belmont.
CROSS-EXAMINATION BY MR. BELMONT:

Q Detective Lugo, when you received the information from Detective, was it Sean Miles or Sheehan Miles?

A Sheehan. It is pronounced Sean. It is spelled Sheehan but pronounced Sean.

Q Okay. You didn't know who the C.I. was, correct?

A Correct.

Q And you didn't know whether or not he had furnished reliable information in the past based upon your conversation from Sheehan Miles, correct?

A I knew that he had furnished information in the past. I didn't know who he was, but I knew he had been an informant for, at the time, Detective Miles, and he had used him before.

Q And did Sheehan Miles inform you as to who the informant was?

A No.

Q Well, then, how could you know, based upon the fact that he said that he received information from a C.I., that this was a C.I. who had furnished reliable information in the past?

A Because when information had been received, he had always referred to him as "my C.I." "My C.I." called me and said we need to go look at this.



Q I mean, he only had one C.I.?

A I don't know how many C.I.'s he had.

Q Well, if he had more than one, that would kind of muddy the water, wouldn't it?

A Possibly.

Q So, you don't really know, of your own personal knowledge, that the C.I. referred to by Officer -- by Detective Sheehan Miles, had furnished reliable information in the past that had led to arrests for other offenses?

A Correct.

Q You don't personally know that?

A Correct.

Q Correct?

A Correct.

MR. BELMONT: That is all, your Honor. No further questions.

THE COURT: Any redirect?

MR. WARD: No, your Honor.

THE COURT: You can step down.

THE WITNESS: Thank you.

(Witness is excused.)

THE COURT: Who is next, Prosecutor?

MR. WARD: Your Honor, the state calls Sheehan Miles.